**In re Beverly MAYS, Debtor.**

**Beverly MAYS, Plaintiff,**

v.

**UNITED STATES of America, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Philadelphia National Bank, and GMAC Mortgage Corporation, Defendants.**

**Bankruptcy No. 87–01300S.**
**Adv. No. 87–0764S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 5, 1988.

Michal Fox, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Virginia R. Powel, Ass't. U.S. Atty., Philadelphia, Pa.

Stephen Raslavich, Philadelphia, Pa., trustee.

Peter M. Campanella, Regional Counsel, Region III, U.S. Dept. of Housing and Urban Development, Philadelphia, Pa.

Edward Sparkman, Philadelphia, Pa., standing Chapter 13 trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The matters before the court, while taking the familiar form of an adversarial case brought by a Debtor-mortgagor to attack a Proof of Claim of a mortgagee, here the UNITED STATES OF AMERICA, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (hereinafter referred to as "HUD"), on the basis of 11 U.S.C. §§ 506(a), (d) and a counter-motion in the main case by the mortgagee seeking relief from the automatic stay on the basis of 11 U.S.C. § 362(d), bristles with provocative issues. We shall allow the Debtor, although presently maintaining this case under Chapter 7 of the Code, to utilize § 506(a) to reduce HUD's claim. However, we refuse the Debtor's attempt to decrease HUD's claim by not only a prior mortgage, but also a prior judgment lien which will be forgiven entirely as long as the Debtor continues to hold title to the property and resides in it until October 28, 1988, which intention is the very reason for her efforts to reduce HUD's claim. We therefore conclude that HUD has a valid secured claim as to $5,925.83 of its asserted claim and is entitled to relief from the automatic stay in light of the failure of the Debtor to adequately protect HUD's secured interest.

### B. PROCEDURAL HISTORY

The Debtor filed her main bankruptcy case under Chapter 13 of the Code on March 17, 1987. The instant Adversary proceeding was preceded by a filing, at Adversaary No. 87–0660S, against GMAC Mortgage Corporation (hereinafter referred to as "GMAC") on July 9, 1987, to attack the validity of a secured Proof of Claim filed by GMAC in the amount of $13,149.19. In its Answer, GMAC alleged that it was merely a servicing agent of the loan for Philadelphia National Bank (hereinafter "PNB"), which, in turn, alleged that it has assigned the mortgage to HUD. On August 19, 1987, this proceeding was refiled against HUD. After an initial period of confusion resulting from HUD's denial

of the assignment and a joinder of both GMAC and PNB as defendants in this proceeding to sort out the liability issue, it was ultimately established that HUD was the sole proper defendant, and it filed an Answer on January 15, 1988.

On March 2, 1988, the trial in the adversary proceeding was conducted. After its conclusion, with the parties' agreement, we established a briefing schedule of which completion was contemplated upon the Debtor's submission of a Reply Brief on April 20, 1988.

However, developments continued apace thereafter, first, later on the very trial date of March 2, 1988, HUD filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d). In what would ordinarily be a most unusual defensive tactic, the Debtor converted the main case to a Chapter 7 case on March 16, 1988. The § 362(d) motion came before us for a hearing on March 30, 1988. Over HUD's rather excessively vigorous objection, we refused to rule on the § 362(d) motion until the adversarial proceeding was decided. When HUD declined our invitation to accelerate the briefing of both matters, we ordered the parties to complete briefing on this motion by April 20, 1988, also.

## C. UNDERLYING FACTS

Upon the insistence of HUD, virtually identical testimony was adduced from Charles Lewis, counsel for the Philadelphia Housing Development Corporation (hereinafter referred to as "PHDC"), not only on March 2, 1988, but also on March 30, 1988. Despite this reiteration, we can discern no factual disputes between the parties whatsoever and therefore we believe that our decision can be prepared, without necessary Findings as to the facts, in narrative form.

PHDC administered a Home Finishers Program in 1983 in which it engaged in the most admirable public service of rehabilitating abandoned homes located in the less desirable areas of Philadelphia and selling them to low-income persons. This program required PHDC to expend much higher costs in rehabilitation than it could realistically realize in selling the completed homes. Therefore, it placed a value on the homes sold, and requested buyers to sign a purchase-money mortgage for this amount. However, it also required the buyers to sign a confessed judgment note for the difference between the actual costs of rehabilitation and the mortgage taken. While the confessed judgment was entered of record, it recited that this obligation "shall be reduced on each anniversary date of the execution of the Note by an amount equal to twenty (20%) percent of the original principle as along as the [buyers'] hold equitable and legal title to the property and maintain personal residence on the premises." Thus, after five years in residence, the buyer would owe nothing on this obligation. Obviously, this was an incentive to keep permanent residents in the rehabilitated homes.

The Debtor bought a home from PHDC situated at 2607 North Fourth Street, Philadelphia, Pennsylvania 19133, under this program on October 28, 1983. A mortgage of $7,200.00, representing PHDC's valuation of the home, was taken against her, which she was to pay. A confessed judgment note in the amount of $28,900.00, representing the difference between the rehabilitation costs and the assigned market value, which would be automatically eliminated if she remained in the home for five years, was also taken against her.

On April 3, 1984, the Debtor incurred a further home-improvement loan from PNB, secured by a mortgage on the premises in the amount of $14,471.00. This was the obligation ultimately assigned to HUD and serviced by GMAC which underlies the obligation in issue in this proceeding.

At the time of the hearing, the Debtor was current on the PHDC mortgage, but had been delinquent on the HUD mortgage since 1985. PHDC filed two Proofs of Claim, one alleging a $7,074.17 balance due on the mortgage as of the filing of the bankruptcy petition and one alleging a balance due on the note of $9,344.00 as of the date of filing and of $3,800.00 as of March 2, 1988. Mr. Lewis indicated that, if the Debtor continued to reside in the premises

until October 28, 1988, the note balance would be eliminated entirely. He also testified, at the March 30, 1988 hearing, that the mortgage balance had been reduced to $6,642.05 as of that date. HUD, meanwhile, had filed a secured proof of claim in the amount of $13,033.07, the validly secured portion of which is in issue is the adversarial case before us.

The parties stipulated that the value of the Debtor's home, at present as well as at filing, was $13,000.00. No other liens against the premises were established in this record.

The Debtor's strategy, a slight variation of that employed in, *e.g.*, *In re Caster*, 77 B.R. 8, 10–14 (Bankr.E.D.Pa.1987); *In re Lopez*, 75 B.R. 961, 962–64 (Bankr.E.D.Pa. 1987), *aff'd*, 82 B.R. 712 (E.D.Pa.1988); and *In re Blakey*, 76 B.R. 465, 468–69, 472–73, *modified*, 78 B.R. 435 (Bankr.E.D.Pa.1987), was particularly ingenious in this factual setting. She argued that the sum of the two PHDC claims, as of the date of filing, exceeded the $13,000.00 value of the home. Therefore, she contended that the value of HUD's interest in the interest of the estate in the premises was zero, and that HUD therefore had no secured claim against her which she was obliged to liquidate to retain her home after bankruptcy. Since HUD was hence left without any valid secured claim, she contended that there was no cause to grant HUD relief under § 362(d).

Not surprisingly, HUD disputed the validity of this reasoning. Unfortunately, much of the reasoning of HUD set forth in its Brief was totally misplaced, and both parties neglected any discussion of the pivotal issue of how a "vanishing lien" should be treated in a § 506(a) determination.

## D. A CHAPTER 7 DEBTOR MAY UTILIZE § 506(a)

■ A threshold issue is whether the Debtor, now proceeding in Chapter 7, can utilize § 506(a) at all. This issue was not presented on March 2, 1988, when the case remained under Chapter 13. At that time, we had an extended colloquy with the Debtor's counsel over *when* property which is the subject of a § 506(a) motion and the secured claims which must be weighed in the § 506(a) process should be valued. It may be that recognition of the intransigence of our holding that the date of confirmation of a Chapter 13 plan rather than the date of filing controls the determination of when the property is evaluated, *see In re Lewis*, 85 B.R. 719, 720 (E.D.Pa.1988); *Blakey, supra,* 76 B.R. at 468–69; *In re Crompton,* 68 B.R. 831, 835 (Bankr.E.D. Pa.1987); and 3 COLLIER ON BANKRUPTCY, ¶ 506.04, at 506–36 (15th ed. 1987), motivated the Debtor's conversion of her case to Chapter 7. Since there is no plan in a Chapter 7 case, it is apparent that the evaluative moment in such a case must be, for all purposes, the date of filing. The desire to maximize the "vanishing lien" of PHDC by evaluating it at the earliest possible date to offset the very permanent and visible HUD mortgage was apparently a motivating factor in the decision to convert.

We previously held, in *In re Kessler*, 76 B.R. 434, 437 (Bankr.E.D.Pa.1987), that a Chapter 7 debtor may utilize § 506(a) to reduce the secured claim of a mortgagee. Several cases have concluded, to the contrary, that, in at least certain settings, § 506(a) cannot be so employed in a Chapter 7 case. *See In re Nefferdorf,* 71 B.R. 217, 219 (E.D.Pa.1984) (debtor had obtained a discharge; secured realty held to no longer be property of the estate [1]); *In re Smith,* 79 B.R. 650 (Bankr.D.Md.1987); *In re Gaglia,* 76 B.R. 82, 84–85 (Bankr.W.D. Pa.1987) (property had been abandoned and hence was no longer property of the estate when § 506(a) was employed); *In re Maitland,* 61 B.R. 130, 132–35 (Bankr.E.D.Va. 1986); *In re Cordes,* 37 B.R. 582, 583–84 (Bankr.C.D.Cal.1984); and *In re Mahaner,* 34 B.R. 308, 309–10 (Bankr.W.D.N.Y.1983);

---

1. An alternative ground for the result, based upon a reading of a since—amended version of § 506(d), 71 B.R. at 218, was relied upon by Judge King of this court. *See In re Nefferdorf,* 26 B.R. 962, 964–66 (Bankr.E.D.Pa.1983). This reading has been criticized by other judges of this court in *In re Jablonski,* 70 B.R. 381, 385–86 (Bankr.E.D.Pa.1987) (SCHOLL, J.); and *In re Everett,* 48 B.R. 618, 620 (Bankr.E.D.Pa.1985) (GOLDHABER, CH. J.).

(court had before it a motion for relief from the automatic stay rather than a § 506(a) motion).

The seminal case in the group cited above is is *Mahaner,* which provides the following three alternative bases for its conclusion: (1) Allowing the debtor to avert a stay motion because the secured party's lien would be avoided by use of § 506(a) "would render 11 U.S.C. § 722 totally surplus;" (2) Allowing a Chapter 7 debtor to avoid liens independent from the restriction of § 1322(b)(2) applicable to a Chapter 13 debtor would have the anomalous effect of giving a Chapter 7 debtor better tools to avoid liens than a Chapter 13 debtor; and (3) A contrary conclusion might be unconstitutional.

 The latter two rationales can be quickly laid to rest. Lien avoidance, in any form, is not unconstitutional. *See In re Ashe,* 712 F.2d 864, 866–68 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1984). We have repeatedly held, with Collier, 5 COLLIER, *supra,* ¶ 1322.06, at 1322–14 to 1322–15, that § 1322(b)(2) is not an impediment to utilization of § 506(a) in a Chapter 13 case despite the presence of § 1322(b)(2). *See, Caster, supra,* 77 B.R. at 13–14; *In re Crompton,* 73 B.R. 800, 805–06 (Bankr.E. D.Pa.1987); and *Jablonski, supra,* 70 B.R. at 386.

We are totally unable to accept the reasoning that the presence of § 722 should have any effect on the use of § 506(a), an argument which reappears in *Smith, Gaglia, Maitland,* and *Cordes.* These courts indicate that § 722 is a very limited tool for two reasons: (1) It is expressly restricted to recovery of personalty for consumer use; and (2) Many courts have held that redemption must be by lump sum rather than installment payment. These limitations would, reason these courts, cause § 722 to be entirely superseded by the flexible nature of § 506(a) if the latter section could be applied in Chapter 7 cases.

It is true that § 722 is rarely used in our court and, we suspect, most courts, mostly because of its above limitations. Another reason for its sparse use is that consumer debtors and their counsel have accurately perceived that few secured vendors of consumer household goods will bother to attempt to enter home to seize or replevy such highly depreciable goods post-bankruptcy whether they are redeemed or not. Negotiation for reaffirmation of a motor vehicle, which could more easily be seized by self-help repossession and hence be the subject of redemption than household goods, is far more common. We seriously doubt that contemplated or actual use of § 506(a) by consumer debtors has had any practical effect on the use or lack of use of § 722. The latter section was simply not very well conceived by the Code draftspersons and is simply too narrow in application to be of much use.

However, it is a quantum leap to assume, as do the courts adopting this reasoning, that, since § 722 is limited in scope, no other Code section could be utilized to expand those limitations. Neither the Code on its face nor any legislative history known to us expressed an intention to limit the avoiding powers of a Chapter 7 debtor to the scope of § 722, and thus prevent Chapter 7 debtors from taking actions to preserve their realty or non-consumer personalty in the bankruptcy. The presence of § 522(f)(1), which clearly is not subject to the limitations of § 722, is evidence of at least one tool which Congress gave to Chapter 7 debtors, *inter alia,* to deal with liens on realty. We therefore believe that reasoning based on the assumption that § 722 pre-empts the field of avoidance tools available to a Chapter 7 debtor is not only dangerously presumptive, but plainly wrong.

Moreover, we do not agree that § 722 serves no purpose even if a debtor could use § 506(a) as an alternative. Section 722, invoked by motion, is a far simpler device to use than § 506(a), which must be effected through an adversary proceeding, *see Jablonski,* 70 B.R. at 385, thus making redemption a potential tool for the pro se or low-budget debtor. We also note that § 722 is available even when the property redeemed has been abandoned. In *Gaglia, supra,* the abandonment of the property

was expressly held to render the use of § 506(a) inapplicable.

We note that a growing number of courts concur with our conclusion that § 722 should not be read as preempting the field of remedies which a Chapter 7 debtor can utilize to retain property and thus preventing such a debtor from utilizing § 506(a). *See In re Richardson*, 82 B.R. 872, 873 (Bankr.S.D.Ohio 1987); *In re Crouch*, 76 B.R. 91, 93 (Bankr.W.D.Va. 1987); *In re O'Leary*, 75 B.R. 881, 884 (Bankr.D.Ore.1987); *In re Worrell*, 67 B.R. 16, 19–20 (C.D.Ill.1986); *In re Lindsey*, 64 B.R. 19, 22–23 (Bankr.C.D.Ill.1986), *aff'd*, 823 F.2d 189 (7th Cir.1987); and *In re Gibbs*, 44 B.R. 475, 478 (Bankr.D.Minn. 1984).

We also note authority at the Court of Appeals level, including our own Court of Appeals, which strongly suggests that § 506(a) can be utilized by a Chapter 7 debtor. In his dissenting opinion in *In re Simonson*, 758 F.2d 103, 111 n. 6 (3d Cir. 1985), Judge Becker expressly stated that "section 506 would appear to provide an alternative way for the Simonsons partly to avoid the ... mortgage." In *Estate of Lellock v. Prudential Insurance Co.*, 811 F.2d 186, 189 n. 3 (3d Cir.1987), the court states that Chapter 7 debtors "did not pursue the appropriate remedy ... [of] seek[ing] a disallowance of the [secured party's] claim ... during their bankruptcy proceeding," presumably pursuant to § 506(a).

We also note that the *Lindsey* bankruptcy court decision was affirmed by the Seventh Circuit. HUD unwittingly cites the language in the *Lindsey* Court of Appeals decision condemning the use of a cramdown, pursuant to 11 U.S.C. §§ 1325(a)(5), 1327, in a liquidation, 823 F.2d at 191, as support for the conclusion that the *Lindsey* court condemned the use of § 506(a) in a Chapter 7 case. However, the Court of Appeals in no sense whatsoever criticized the use of § 506(a) to, as it put it, "strip

down" the creditor's lien. The Court affirmed the "strip-down." *Id.* In the passage cited by HUD, the Court is merely responding to the appeal of the debtor from the refusal of the district court and the bankruptcy court to establish "a payment-schedule for the stripped-down mortgage." *Id.* at 190.[2]

We also note that, in *Gaglia*, Judge Bentz failed to cite the prior decisions of the past and present Chief Judges of his own court which held directly to the contrary of his result on this point. *See In re Vigne*, 18 B.R. 946, 948 (Bankr.W.D.Pa. 1982) (GIBSON, CH. J.); and *In re Tanner*, 14 B.R. 933, 935–38 (Bankr.W.D.Pa.1981) (COSETTI, present CH. J.). Finally, we also note the decision by our own court's former Chief Judge which is consistent with our result in *Kessler*. *See In re Bracken*, 35 B.R. 84, 85 (Bankr.E.D.Pa. 1983) (GOLDHABER, CH. J.). We therefore conclude that the weight of local and national authority supports the conclusion that § 506(a) can be utilized by a Chapter 7 debtor.

### E. SEVERAL ARGUMENTS OF HUD CAN BE QUICKLY REJECTED, ALTHOUGH ONE OF ITS ARGUMENTS LEADS US TO A USEFUL COMPARISON BETWEEN § 522(f)(1) AND § 506(a).

█ HUD makes two purely misguided arguments to the contrary to our conclusion that § 506(a) can be employed by a Chapter 7 debtor, in addition to misreading *Lindsey*. First, it claims that the Debtor's lack of equity in the premises precludes characterization of the Debtor's interest in the realty as "property of the estate," under 11 U.S.C. § 541(a)(1). Thus, the Debtor's estate is said to lack an "interest" in the property such as is requisite to invoke § 506(a). However, "property of the estate" is a broad concept, and would clearly include the Debtor's possessory interest in the premises, putting aside her legal and equitable title to the property. *See e.g.,*

---

**2.** The bankruptcy court had granted the debtors a 30–day period to redeem their mortgage and directed that the automatic stay would be lifted if no redemption transpired in that period. 64 B.R. at 25. However, it did not hesitate to utilize § 506(a) to "strip down" the mortgage. *Id.* at 22–24.

*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983); *In re Ford*, 78 B.R. 729, 734–35 (Bankr.E.D.Pa.1987). *Cf. In re Sudler*, 71 B.R. 780, 786 n. 1 (Bankr.E.D. Pa.1987) (naked possessory interest of tenant whose lease is terminated pre-petition is property of the estate protected by the automatic stay). Furthermore, § 506(a) is only of use to a debtor when equity is absent in purportedly secured property, thus allowing the purportedly secured creditor's interest to be bifurcated into a secured and unsecured claim or, as the *Lindsey* court puts it, to be stripped down, by the debtor. Therefore, if a debtor needed to have equity in the property to invoke § 506(a), this Code Section would be, by definition, rendered entirely nugatory. This argument is therefore utter nonsense.

Secondly, HUD argues that we should apply what it contends is the holding of *Simonson, supra*—that a debtor lacking equity in real property cannot utilize 11 U.S.C. § 522(f)(1) to avoid a judicial lien against it—in the context of application of § 506(a). This argument fails for several reasons, not the least of which is that *Simonson* does not so hold as to § 522(f)(1), as we pointed out in *In re Chandler*, 77 B.R. 513, 519–20 (Bankr.E.D.Pa.1987); and *In re Magosin*, 75 B.R. 545, 547 (Bankr.E. D.Pa.1987).[3]

Moreover, as Judge Becker's dissent in *Simonson* points out, 758 F.2d at 111 n. 6, the fact that avoidance of a lien cannot be accomplished by § 522(f)(1) does not preclude its avoidance by § 506(a).[4]

Indeed, the two statutory provisions are distinct in their operation and effect. Section 522(f)(1) preserves exemptions, and therefore allows the debtor to add the sum of the debtor's available exemptions to the unavoidable liens against the property in the determination of what liens or portions

thereof can be avoided. *See Magosin, supra*, 75 B.R. at 547. The debtor using § 506(a) can only eliminate a lien which is unsecured, with no allowances for exemptions. Per the holding of *Simonson*, mortgages can never be avoided at all by use of 522(f)(1). 758 F.2d at 105–06. However, they can indeed be avoided by § 506(a). As we recited above, Judge Becker points out in his dissent, *id.* at 111 n. 6, that, in a § 506(a) determination, a lien avoidable under § 522(f)(1) may indeed take precedence over a mortgage which the *Simonson* majority holds cannot be avoided pursuant to § 522(f)(1). *Accord, Vigne, supra*, 18 B.R. at 949.

More significant to the case at bar are the more sensitive issues of timing of valuations in a § 506(a) proceeding, which is distinct from the timing considerations relevant to a § 522(f)(1) proceeding. As *Lewis, supra*, and *In re Spadel*, 28 B.R. 537, 538–39 (Bankr.E.D.Pa.1983), teach, a § 506(a) complaint must be initiated prior to confirmation, or the right to utilize it may be lost forever. On the other hand, cases are liberally reopened to allow § 522(f)(1) motions to be filed even after discharge and closing of the case has occurred. *See, e.g., In re Quackenbos*, 71 B.R. 693, 696–97 (Bankr.E.D.Pa.1987) (FOX, J.); and *In re Skakalski*, 67 B.R. 448, 450–51 (Bankr.W.D.Pa.1986) (BENTZ, J.).

A large part of the rationale for the difference in significance of timing is that the process of valuation of the secured property, as well as the measurement of the claims, is frozen as of the date of filing for purposes of use of § 522(f)(1). *See Chandler, supra*, 77 B.R. at 516; *In re Rappaport*, 19 B.R. 971, 973 (Bankr.E.D. Pa.1982) (GOLDHABER, CH. J.); and *Tanner, supra*, 14 B.R. at 936–37. However, at least in a Chapter 13 case, the time of valuation in a § 506(a) proceeding is the

---

**3.** We note that Judge Bentz does so mis-interpret *Simonson* in *Gaglia*. 76 B.R. at 85. In so doing, he tramples upon other precedents by his colleagues in that court. *See In re Martz*, 57 B.R. 345 (Bankr.W.D.Pa.1986) (MARKOVITZ, J.); and *In re Losieniecki*, 17 B.R. 136 (Bankr.W. D.Pa.1981) (COSETTI, J.). *Accord*, with *Chandler, e.g., In re Bickleman*, 71 B.R. 135, 137

(Bankr.E.D.Pa.1987) (TWARDOWSKI, CH. J.) (treatment of Exeter Associates, Inc. lien).

**4.** In *Gaglia*, Judge Bentz "hesitate[s] to cloud" his discussion of § 506(a) with reference to § 522(f)(1). 76 B.R. at 85. HUD displays no such hesitancy.

date of confirmation. *See Lewis, supra,* at 720, and the other authorities on this point cited at page 958 *supra.*

Therefore, we clearly cannot, as HUD suggests, carry over principles applicable to § 522(f)(1) motions wholesale to § 506(a) proceedings. However, the fact that § 506(a) determinations are not rendered on valuation bases fixed at filing, like a § 522(f)(1) motion, is ultimately a concept very helpful to HUD in our final resolution.

### F. CLAIMS MUST BE VALUED AS OF THE DATE OF THE ORIGINAL BANKRUPTCY FILING, EVEN IN CASES CONVERTED FROM CHAPTER 13 TO CHAPTER 7

HUD suggests, we again think incorrectly, that all of the pertinent claims, i.e., both of the PHDC claims, should be measured as of some date later than the date of the Debtor's original filing. Thus, they adduced testimony from Mr. Lewis indicating that the mortgage and note balances had been reduced to $6,642.05 and $3,356.48, respectively, as of March 30, 1988.

However, as 11 U.S.C. § 502(b) expressly states, the amount of a claim is determined "as of *the date of the filing of the petition* (emphasis added)," and is to be allowed in the amount due on the claim as of that date. Therefore, for purposes of § 506(a), claims must be valued as of the date of filing. *See, e.g., In re Wells,* 52 B.R. 368, 369 (Bankr.E.D.Pa.1985); and *In re Pitre,* 11 B.R. 777, 781 (Bankr.N.D.Ill. 1981).

We also believe that the conversion of the case to Chapter 7 as of March 16, 1988, does not alter the fact that the date of filing is the significant date for valuation of claims. *See* 11 U.S.C. § 348(a) ("[c]onversion of a case from a case under one chapter of this title to another chapter of this title ... does not effect a change in *the date of the filing of the petition "* (emphasis added)). *Cf. In re Gillen,* 69 B.R. 255, 257 (E.D.Pa.1986) (original filing

date controls in determination of what constitutes property of the estate); and *In re Allen,* 69 B.R. 867, 875 (Bankr.E.D.Pa. 1987) (change in the date of "the order for relief" is only effected where the Code section is recited in § 348(b); generally the original filing date is the date of "the order for relief").[5] As a result of the foregoing analysis, we have no hesitancy in fixing the mortgage claim of PHDC at the $7,074.17 figure that it stood at the time of the filing of the petition, contrary to HUD's position that the claim should be valued at the $6,642.05 figure that it stood on March 30, 1988.

However, we have a great deal of difficulty in valuing the PHDC note claim.

### G. THE CONTINGENT PHDC CLAIM WILL NOT BE VALUED AT ITS FACE VALUE BY US, BUT AT ZERO.

Where we begin to part company from the Debtor is her reliance upon *In re Camp,* 78 B.R. 58, 64 (Bankr.E.D.Pa.1987), for the principle that "[t]he filing of a bankruptcy petition represents the traditional point when the rights of creditors are established," as applied to the issue of valuation of the PHDC note. While this statement is true in a general sense, we are not certain that it is true when the claim is contingent. Our one small point of reservation from the result reached by Judge Fox in *Camp* was his classification of the welfare-lien claims in issue there as unmatured as opposed to contingent. *See In re Andrews,* 78 B.R. 420, 424–26 (Bankr.E.D. Pa.1987). When a claim is contingent, it is possible that it should not be evaluated at its face value, but rather its value is determined by the court in a process which, in its broad discretion, must weigh the contingencies. *See Bittner v. Borne Chemical Co.,* 691 F.2d 134, 135–37 (3d Cir.1982); and *In re Baldwin-United Corp.,* 55 B.R. 885, 910–11 (Bankr.S.D.Ohio 1985).

---

5. We therefore observe that the Debtor's conversion of this case did not have the effect of altering the valuation process at all, as she may have supposed. The only valuation which might have changed because of the conversion was valuation of the Debtor's home. However, HUD stipulated that the value of the home was, at all times, $13,000.00.

On the date of filing, March 17, 1987, the figure due on the note was, in one sense, $9,344.00. However, that was the figure that the Debtor *would* have owed had she transferred title to or moved out of her home on that date. Viewing PHDC's claim as a claim contingent on whether the Debtor transferred title or moved prior to October 28, 1988, or not would make its precise calculation at that moment almost metaphysical. We conclude, however, that several factors should cause us to discount it entirely, or value it at zero, in the § 506(a) valuation process.

The first is an observation made in one of the few authorities cited by HUD which *is* pertinent to the issues at hand, *In re Lackow Brothers, Inc.*, 752 F.2d 1529, 1532 (11th Cir.1985).[6] There, the court remarks that valuation, for purposes of § 506(a), is not legislatively dictated, but that it must be determined "on case-by-case basis, taking into account the facts of each case and the competing interests in the case." The equities of the Debtor's using her "vanishing lien" to make the HUD lien vanish, and then to observe that the likely result is that both will vanish, offends our sense of equity. We are also somewhat disturbed by the post-trial conversion of this case to Chapter 7 to apparently avoid one of the few unpleasant trade-offs arising from the use of Chapter 13, i.e., a § 506(a) valuation which measures the value of the secured property as of the date of confirmation, when the Debtor's equity is rapidly increasing due solely to the "vanishing lien."[7] Our sensitivities suggest that the fine line of over-manipulation may have been crossed.

Secondly, as we pointed out in *In re Lopez, supra,* 75 B.R. at 964, § 506(a), in its last sentence, provides that the value of a property, for purposes of this Code section, "shall be determined in light of … the proposed disposition or use of such property, …" Partially for that reason, we allowed the *Lopez* debtor to utilize the fair market value as a basis for the valuation of his home rather than what the mortgagee could have received for the property from its insurer. The use of her home which the Debtor here has clearly contemplated all along is, like the *Lopez* Debtor, to continue to own it and live in it. That is undoubtedly the reason that she wishes to save it. That is why she would not allow it to be abandoned either as property of her estate or literally.

The Debtor obviously intends to continue to use her home as a residence through October 28, 1988, when she will wipe out the PHDC note entirely, and beyond. We believe that the only assumption which can be made consistent with this proposed use of the premises is to assume that she will indeed continue to reside in the premises through October 28, 1988, and eliminate the PHDC's note entirely as of that date. Hence, practically speaking, there has been, since the date of filing, very little probable contingency that the Debtor would have any amount to pay on this obligation.

It was partially because of this very intent of the Debtor to retain her home that we declined to apply the reasoning of *Gaglia, supra;* or *Nefferdorf, supra,* and allowed the Debtor, though in Chapter 7, to employ § 506(a) as to HUD's claim. The Debtor here has not been discharged, nor had she abandoned her home. The home was, to her, perhaps the most important of the property of her estate, despite her lack of equity in it. We think that it would be grossly inconsistent to disregard her in-

---

**6.** We should also note another frivolous argument of HUD which can be readily rejected: that the secured status of the PHDC note is avoidable pursuant to § 522(f)(1) and hence should not be counted in the valuation process for § 506(a). However, clearly that claim *is* secured unless and until it is avoided. Neither the Trustee nor the Debtor has sought to use § 522(f)(1) to avoid the PHDC judgment lien or attack the PHDC confessed judgment as unconstitutional. *See In re Souders,* 75 B.R. 427 (Bankr.E.D.Pa.1987). Nor has HUD sought to attack this claim, assuming it has standing to do so. *See In re Morrison,* 69 B.R. 586, 588–90 (Bankr.E.D.Pa.1987).

**7.** But see page 962 n. 5 *supra.* It is not clear that the conversion effected any positive benefit for the Debtor in this regard. Hence, the conversion may have been motivated by other factors.

tended continued possession of the premises in measuring the contingency of PHDC's claim on its note. This is her "intended use" of the property, which we must consider in the § 506(a) valuation process.

Thirdly, the one case which we have located which is factually analogous, *In re Moellenbeck*, 83 B.R. 630 (Bankr.S.D.Iowa 1988), does not support the position of this Debtor here. In that matter, a farm case filed under Chapter 12, the Debtor endeavored to wipe out an alleged secured claim of a bank holding a mortgage under § 506(a) by asserting that a federal estate tax lien of the Government was prior to the bank's deed of trust. The Internal Revenue Code contains a provision stating that the estate tax lien would be unenforcible if farming operations continued fifteen years after the death of the husband-Debtor's decedent, which had occurred in 1978. Although the contingency there was greater than here—the Debtors would have to continue to farm the premises through 1993 to eliminate the tax lien—the court refused to consider the federal estate tax lien as a secured claim at all for purposes of the § 506(a) calculation. Part of the court's reasoning was based upon application of "general equitable principles" in refusing to allow a debtor to use a "vanishing lien" to vanquish an otherwise intact security interest. At 632.

Finally, we find it impossible to close our eyes to the fact that October 28, 1988, is only about six months away. The chances of the Debtor's transferring or leaving the property and failing to wipe out the contingent claim of PHDC at this point appear infinitesimal.

■ We therefore conclude that we cannot count PHDC's claim in making the computation for purposes of § 506(a). Thus, we shall consider only the first mortgage claim of PHDC in the amount of $7,074.17 as prior to HUD's lien against the Debtor's home, agreed to be valued at $13,000.00, in our valuative process. We therefore shall reduce the value of HUD's secured claim to $5,925.83.

## H. HUD IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY TO ENFORCE ITS REMAINING SECURITY INTEREST

■ Had we wiped out HUD's claim entirely, as per *Bracken, supra*, 35 B.R. at 85–86, we undoubtedly would have denied HUD's § 362(d) motion. However, not having reached this conclusion, we are compelled to grant HUD relief from the automatic stay under § 362(d)(1). We disagree with the apparent conclusion in *In re Fazio*, 59 B.R. 312, 313 (Bankr.E.D.Pa.1986), cited, *inter alia*, by HUD, that proof of lack of equity inevitably justifies relief from the automatic stay under § 362(d)(2) in a Chapter 7 case. As we pointed out in *Crompton, supra*, 73 B.R. at 811–12, there is doubt whether § 362(d)(2) is applicable to any but a Chapter 11 case, and the Debtor's need for her home, relevant to the presence of the elements of § 362(d)(2)(B), is undoubtedly very real.

However, the Debtor has not made any payments to HUD since 1985. She presented no evidence that she would make payments, nor make any other performance which might constitute adequate protection of HUD's secured interest in the premises. As *Lindsey* teaches, there is no way to formulate a plan to cure a default in a Chapter 7 case. Clearly, the Debtor has no equity cushion.

The similarly-situated *Kessler* debtor offered to make double payments on his mortgage in a desperate attempt to put forth something as adequate protection to his mortgagee. In nevertheless granting his mortgagee relief from the stay, we characterized his offer as "both too little and too late" to avert a motion based on § 362(d)(1). 76 B.R. at 439. Here, the Debtor has offered nothing, neither little nor late. Her conversion of her bankruptcy case to Chapter 13 eliminates any prospect of her curing HUD's secured claim in her bankruptcy. Therefore, HUD is entitled to relief from the stay.

We should add that we are confident that the apparent harshness of this result will be tempered by HUD's willingness to work with the Debtor to allow her to retain her

home, thereby fulfilling its statutory purpose of assisting the needy in procurement and retention of housing. If not, we feel confident that the Debtor's able counsel will take further appropriate measures on behalf of her client, such as vigorously defending any foreclosure action and/or revisiting Chapter 13.

## I. CONCLUSION

However, on this record in this case, we are constrained to enter the attached Order.

## ORDER

AND NOW, this 5th day of May, 1988, after trial of the above-entitled Adversary proceeding on March 2, 1988, and after a hearing on the Motion of the United States of America, Department of Housing and Urban Development (hereinafter referred to as "USA") for relief from the automatic stay in the main case on March 30, 1988, it is ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Debtor, BEVERLY MAYS, and against the Defendant USA on the claims set forth in the Adversary Complaint, and the extent of the value of the Mortgagee in the Debtor's interest in her premises at 2607 North Fourth Street, Philadelphia, Pennsylvania 19133, is hereby determined to be $5,925.83.

2. The USA's Motion for Relief from the Automatic Stay is GRANTED.

3. This Order shall be filed and docketed in both the above-captioned main case and Adversary proceeding.